UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20414-GAYLES

UNITED STATES OF AMERICA

v.

H.W. WOOD LIMITED,

Defendant.

---

## DEFERRED PROSECUTION AGREEMENT

Defendant H.W. Wood Limited (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the attached one-count criminal Information in the United States District Court for the Southern District of Florida charging the Company with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3. In so doing, the Company: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth

1

Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) agrees that the charges in the Information and any charges arising from the conduct described in the Statement of Facts are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement. The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, the Company will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United

2

States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 20 to 24 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

## Relevant Considerations

4.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      The nature and seriousness of the offense conduct, as described in the Statement of Facts, including the Company's participation in a bribery scheme to obtain reinsurance business in Ecuador;

3

b.      The Company did not receive voluntary disclosure credit pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy, or pursuant to U.S. Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

c.      the Company received credit for its cooperation with the Fraud Section's investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Company also received credit for its cooperation and timely remediation pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy, by, among other things: (i) meeting the Fraud Section's requests promptly; (ii) endeavoring to make foreign-based employees available for interviews; (iii) collecting and producing voluminous relevant documents to the Fraud Section, including documents located outside the United States; (iv) making several detailed factual presentations to the Fraud Section and conducting and producing financial analyses of voluminous transactions; and (v) timely accepting responsibility and reaching a prompt resolution.

d.      the Company provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts attached hereto as Attachment A and conduct disclosed to the Fraud Section prior to the Agreement;

e.      the Company engaged in timely remedial measures, including: (i) terminating an employee involved in the misconduct; and (ii) enhancing its compliance program,

4

including creating new compliance positions and compliance control improvements, implementing a process to ensure continuous monitoring and review of third-party relationships, and updating and enhancing its policies and procedures, as well as its compliance training and communications.

        f.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

        g.      the Company has no prior criminal, civil, or regulatory history;

        h.      the Company has agreed to continue to cooperate with the Fraud Section in any ongoing investigation as described in Paragraph 5 below;

        i.      the Company met its burden of establishing an inability to pay the criminal penalty sought by the Fraud Section, despite agreeing that the proposed amount was otherwise appropriate based on the law and the facts, and fully cooperated by providing information and documents and access to appropriate Company personnel to respond to prosecutors' inquiries. The Fraud Section, with the assistance of a forensic accounting expert, conducted an independent ability to pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (*see* Oct. 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and Sentencing Guidelines § 8C3.3(b); (ii) the Company's current financial condition; and (iii) the Company's alternative sources of capital. Based on that independent analysis, the Fraud Section determined that paying a criminal penalty greater than

5

$508,000 within ten business days of the beginning of the Term would substantially threaten the continued viability of the Company; and

   j.  accordingly, after considering (a) through (i) above, the Fraud Section has determined that a deferred prosecution agreement and a penalty of $508,000 is sufficient but not greater than necessary to achieve the purposes described in 18 U.S.C. § 3553.

   k.  Based on the Company's remediation and the state of its compliance program, and the Company's agreement to report to the Fraud Section as set forth in Attachment D to this Agreement, the Fraud Section determined that an independent compliance monitor is unnecessary.

## Ongoing Cooperation and Disclosure Requirements

   5.  The Company shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in paragraph 3. At the request of the Fraud Section, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section at any time during the Term. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and

6

national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Company represents that it has timely and truthfully disclosed all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the attached Statement of Facts, as well as any other conduct under investigation by the Fraud Section at any time about which the Company has any knowledge. The Company further agrees that it shall promptly and truthfully disclose all factual information with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants related to the conduct described in this Agreement or the Statement of Facts about which the Company shall gain any knowledge or about which the Fraud Section has inquired or may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Company, including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.      Upon request of the Fraud Section, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and

7

materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

        c.    The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

        d.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company consents to any and all disclosures to other governmental authorities, subject to applicable laws and regulations, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

6.    In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section.

## **Payment of Monetary Penalty**

7.    The Fraud Section and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

        a.    The November 1, 2021 U.S.S.G. are applicable to this matter.

b. <u>Offense Level</u>. Based upon U.S.S.G. § 2C1.1, the total offense level is 34, calculated as follows:

| | |
|---|---|
| § 2C1.1(a)(2)  Base Offense Level | 12 |
| § 2C1.1(b)(1)  More than One Bribe | +2 |
| §§ 2C1.1(b)(2), 2B1.1(b)(1)(K) Value of Benefit Received (more than $9,500,000) | +20 |
| **TOTAL** | 34 |

c. <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a)(1), the base fine is $50,000,000.

d. <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 3, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (g)(2) | Cooperation, Acceptance | -2 |
| | **TOTAL** | 3 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $50,000,000 |
| Multipliers | 0.6 (min) / 1.2 (max) |
| Fine Range | $30,000,000 / $60,000,000 |

8.      The Fraud Section and the Company agree, based on the application of the Sentencing Guidelines, that the appropriate criminal penalty is $22,500,000. This reflects a 25 percent discount off the bottom of the Sentencing Guidelines fine range.

9.      The Company has made representations to the Fraud Section, and provided supporting evidence, that the Company has an inability to pay a $22,500,000 criminal penalty. Based on those representations, and an independent analysis verifying the accuracy of those

representations conducted by the Fraud Section (with the assistance of a forensic accounting expert), the parties agree that a criminal penalty of $508,000 is appropriate.

10.    The Company agrees to pay a monetary penalty in the amount of $508,000 to the United States Treasury within ten business days of the beginning of the Term. Due to the Company's inability to pay, the Company's payment obligations to the United States will be complete upon the Company's payment totaling $508,000. The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement. The $508,000 penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $508,000 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the $508,000 penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the attached Statement of Facts.

## Forfeiture

11.     As a result of the Company's conduct, including the conduct set forth in the attached Statement of Facts, the parties agree the Fraud Section could institute a civil and/or criminal forfeiture action against certain funds held by the Company and that such funds would be forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461(c). The Company hereby admits that the facts set forth in the Statement of Facts establish that at least $2,338,735, representing the proceeds traceable to the commission of the offense, is forfeitable to the United States (the "Forfeiture Amount"). However, based on the Company's representations and independent analysis set forth in Paragraph 9 and the Company's agreement to pay a criminal penalty of $508,000, the parties agree that the Company is unable to pay the Forfeiture Amount.

12.     In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section is not limited to the Forfeiture Amount.

## Conditional Release from Liability

13.     Subject to Paragraphs 20 to 24, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to this Agreement. The Fraud Section, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

11

a.    This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.    In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

14.    The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

15.    In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The

compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

16.     The Company agrees that it will report to the Fraud Section annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

17.     Thirty days prior to the expiration of the Term, the Company, by the Chief Executive Officer and Chief Compliance Officer, will certify to the Fraud Section in the form of executing the document attached as Attachment F to this Agreement, that the Company has met its compliance obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Deferred Prosecution

18.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

19.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement

13

shall expire. Within six months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts. If, however, the Fraud Section determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 18, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 20 to 24, remains in full effect.

## Breach of the Agreement

20.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 14 and 15 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the Southern District of Florida or any other appropriate venue. Determination of whether the Company has breached the Agreement

14

and whether to pursue prosecution of the Company shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

21.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

15

22.     In the event that the Fraud Section determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

23.     The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.     The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

24.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section, in the form of executing the document

16

attached as Attachment E to this Agreement, that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

25.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction or transactions will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any

17

time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 20 to 24 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

## Public Statements

26. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 20 to 24 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in

18

other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

27.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

28.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

29.     This Agreement is binding on the Company and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although

the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company. If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

### Notice

30. Any notice to the Fraud Section under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Washington, DC 20005. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Steven Rudduck, Managing Director, H.W. Wood Limited, 1 Lloyd's Avenue, London, EC3N 3DQ, UK. Notice shall be effective upon actual receipt by the Fraud Section or the Company.

### Complete Agreement

31. This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section. No amendments, modifications or additions to this

20

Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR H.W. WOOD LIMITED:**

Date: 16TH November 2023        By: _____

Steven Rudduck
Managing Director
H.W. Wood Limited

Date: 11/16/23        By: _____

Daniel Rubinstein.
Joanna Travalini
Sidley Austin LLP
Counsel for H.W. Wood Limited

**FOR THE DEPARTMENT OF JUSTICE:**

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 11/20/23        By: _____

Katherine Raut
Anthony Scarpelli
Trial Attorneys
Alexander Kramer
Assistant Chief

21

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for H.W. Wood Limited (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Managing Director for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 16TH November 2023

H.W. Wood Limited

By: _____

Steven Rudduck
Managing Director

**CERTIFICATE OF COUNSEL**

I am counsel for H.W. Wood Limited (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Managing Director of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 11/16/23

By: _____

Daniel Rubinstein
Joanna Travalini
Sidley Austin LLP
Counsel for H.W. Wood Limited

ATTACHMENT A
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and H.W. Wood Limited ("H.W. Wood" or the "Company"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to the Company. The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

**Relevant Entities and Individuals**

1.      The defendant H.W. Wood Limited was an international reinsurance broker based in the United Kingdom.   H.W. Wood was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

2.      "H.W. Wood Employee," a United Kingdom citizen and resident, whose identity is known to the United States and the Company, was an employee of H.W. Wood who served as a broker with primary responsibility over the Company's Ecuadorian public reinsurance business. H.W. Wood Employee was an "agent" and an "employee" of H.W. Wood as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

3.      "Intermediary Company" collectively refers to two companies whose identities are known to the United States and the Company, that were registered in Panama and Ecuador,

A-1

operated in Miami, Florida, and acted as intermediaries for reinsurance companies.  Intermediary Company acted as an "agent" of H.W. Wood as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

4.     Esteban Eduardo Merlo Hidalgo ("Merlo") was an Ecuadorian and United States dual citizen who resided in Miami, Florida.  Merlo operated and controlled Intermediary Company. Merlo acted as an "agent" of H.W. Wood as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

5.     Luis Lenin Maldonado Matute ("Maldonado") was an Ecuadorian citizen and Costa Rican resident and the president of Intermediary Company.  Maldonado acted as an "agent" of H.W. Wood as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

6.     Cristian Patricio Pintado Garcia ("Pintado") was an Ecuadorian and Italian dual citizen and resident of Costa Rica and the general manager of Intermediary Company.  Pintado acted as an "agent" of H.W. Wood as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

7.     Seguros Sucre S.A. ("Seguros Sucre") was a state-owned insurance company of Ecuador.  Seguros Sucre was controlled by the government of Ecuador and performed a function that Ecuador treated as its own.  It was an "instrumentality" of the Ecuadorian government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

8.     Seguros Rocafuerte S.A. ("Rocafuerte") was a state-owned insurance company of Ecuador.  Rocafuerte was controlled by the government of Ecuador and performed a function that Ecuador treated as its own.  It was an "instrumentality" of the Ecuadorian government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

9.     Juan Ribas Domenech ("Ribas") was a citizen of Ecuador who, from at least in or

A-2

around 2013 through at least in or around 2017, served as the chairman of both Seguros Sucre and Rocafuerte and as an advisor to a then-high ranking executive branch official in the Ecuadorian government.  Ribas was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

10.     "Foreign Official 1," an individual whose identity is known to the United States and the Company, was a citizen of Ecuador who served as an official of Seguros Sucre from at least in or around 2013 through at least in or around 2017.  Foreign Official 1 was a "foreign official" as the term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

11.     "Foreign Official 2," an individual whose identity is known to the United States and the Company, was a citizen of Ecuador who served as an official of Seguros Sucre from at least in or around 2015 through at least in or around 2019.  Foreign Official 2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

12.     "Foreign Official 3," an individual whose identity is known to the United States and the Company, served as an official of Seguros Sucre from at least in or around 2014 through at least in or around 2018.  Foreign Official 3 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

13.     Fernando Martinez Gomez ("Martinez") was a United States and Ecuadorian dual citizen who worked as a financial advisor for an international investment firm from in or around 2009 through in or around 2016.  Martinez was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

14.     Tysers Insurance Brokers Limited ("Tysers") (formerly known as and doing business during the relevant period as Integro Insurance Brokers Limited, or "Integro") was a

reinsurance broker based in the United Kingdom.

15.     "Tysers Employee 1," an individual whose identity is known to the United States and the Company, was a United Kingdom citizen and resident.  Tysers Employee 1 was an international reinsurance broker for Tysers with responsibility for developing certain segments of Tysers' Ecuador reinsurance business.

16.     "Tysers Employee 2," an individual whose identity is known to the United States and the Company, was a United Kingdom citizen and resident.  Tysers Employee 1 was an international reinsurance broker for Tysers with responsibility for developing certain segments of Tysers' Ecuador reinsurance business.

17.     "Tysers Employee 3," an individual whose identity is known to the United States and the Company, was a United Kingdom citizen and resident.  Tysers Employee 3 was an international reinsurance broker for Tysers with responsibility for developing certain segments of Tysers' Ecuador reinsurance business and was the head of a division of Tysers.

<u>**The Bribery Scheme**</u>

18.     Between in or around 2013 and in or around 2017, H.W. Wood, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, Ecuadorian officials to secure improper advantages in order to obtain and retain reinsurance business from Seguros Sucre and Rocafuerte.

19.     The business of reinsurance provides insurance for insurance companies, which involves the transfer to a reinsurance company of all or part of an insurance company's risk of paying claims under a policy.  A reinsurance broker such as H.W. Wood arranges the transfer of risk.  The broker collects the premium due from the insurance company to the reinsurance company.  The broker is typically paid for its services by retaining a portion of the premium as a

commission.

20.     In furtherance of the scheme, Intermediary Company introduced H.W. Wood and Tysers to Ribas and other Seguros Sucre and Rocafuerte officials soon after Ribas became the chairman of both Seguros Sucre and Rocafuerte.   During the relevant period, Intermediary Company paid bribes totaling at least approximately $2.8 million on behalf of and for the benefit of H.W. Wood, Tysers, and Intermediary Company to bank accounts, including those in the Southern District of Florida, as well as Panama and Switzerland.   These bank accounts were held in the Ecuadorian officials' names and in the names of third parties and nominee account holders for the officials' benefit.   Insurance payments from Seguros Sucre and Rocafuerte to H.W. Wood and Tysers funded the payments from H.W. Wood and Tysers to Intermediary Company that were used to pay the bribes.   To effectuate the scheme, H.W. Wood paid approximately $7.9 million in commissions and premium payments to Intermediary Company.    H.W. Wood retained commissions of approximately $2.3 million.

21.     H.W. Wood approved Intermediary Company as a "producing agent" in or around August 2013.    H.W. Wood paid Intermediary Company a portion of its commissions for Ecuadorian public reinsurance business that Intermediary Company helped H.W. Wood obtain. H.W. Wood had decision-making authority as to commission splits and business opportunities involving Intermediary Company.  H.W. Wood was ultimately responsible to the insurer (Seguros Sucre or Rocafuerte) and the insured client on the business Intermediary Company helped it obtain.

22.     H.W. Wood approved Intermediary Company as a "placing broker" in or around January 2014.  In this capacity, H.W. Wood received premium payments from Seguros Sucre or Rocafuerte, which it transferred to Intermediary Company, less a commission for H.W. Wood. Intermediary Company was obligated to transfer the premiums to reinsurers, less a commission

for Intermediary Company.  However, Intermediary Company only transferred a portion, often less than half – sometimes as little as 25 percent—of the premium payments it received from H.W. Wood to reinsurers and instead used these funds to, among other things, pay bribes to Seguros Sucre and Rocafuerte officials.

23.     H.W. Wood Employee and others at H.W. Wood knew that Ecuador had prohibited the use of local brokers and intermediaries due to anti-corruption concerns and that Intermediary Company's roles as H.W. Wood's producing agent and placing broker violated Ecuador's prohibition.  H.W. Wood nonetheless decided to use Intermediary Company and understood that, per Intermediary Company emails received by H.W. Wood Employee and another H.W. Wood executive in or around 2013 and 2015, Intermediary Company had to remain "invisible" from Seguros Sucre and Rocafuerte.

24.     During the course of the scheme, Merlo and Ribas met in person in the Southern District of Florida to discuss bribe payments to Ribas on behalf of and for the benefit of H.W. Wood, Tysers, and Intermediary Company.

25.     During the course of the scheme, Merlo, including while in the Southern District of Florida, exchanged text messages with Foreign Official 2 and Foreign Official 3 regarding directing certain reinsurance business to H.W. Wood and Tysers, being on a team, taking care of the interests of the families of Foreign Official 2 and Foreign Official 3, and meeting in secret in the Southern District of Florida.

A.     Introduction to Seguros Sucre and Rocafuerte Officials and Agreement to Hide Intermediary Company's Role

26.     Soon after Ribas was appointed chairman of Seguros Sucre and Rocafuerte, Intermediary Company introduced H.W. Wood to Ribas.  Specifically, on or about September 24,

2013, Maldonado emailed H.W. Wood Employee and asked for a presentation from H.W. Wood, stating "I need this for a meeting with Juan Ribas and introduce him your Company."

27.     On or about October 1, 2013, Pintado emailed H.W. Wood Employee, copying Maldonado, regarding the "opportunity to start to doing business [*sic*] with Seguros Sucre and Rocafuerte," stating that Intermediary Company had introduced H.W. Wood to Ribas, "the new Executive Chairman" of those entities.  According to Pintado's email, Ribas considered H.W. Wood a "good option for the brokerage of the reinsurance of the Ecuadorian public accounts." Pintado instructed H.W. Wood Employee to send a letter to Ribas with language provided by Pintado to set up a meeting, and to blind copy Maldonado and Pintado, stating "our names can not appear in the email."

28.     The following day, on or about October 2, 2013, H.W. Wood Employee emailed Ribas a letter introducing H.W. Wood and seeking a meeting with Ribas, as Pintado instructed.

29.     On or about October 4, 2013, Pintado emailed H.W. Wood Employee, copying Maldonado, summarizing a phone call that occurred the day before.  Pintado described an arrangement in which H.W. Wood would manage Intermediary Company's portfolio in Ecuador because the president of Ecuador had decided that reinsurance placement for Seguros Sucre and Rocafuerte could not involve local intermediaries. This restriction was due to fraud and anti-corruption concerns.  Pintado stated that Seguros Sucre's and Rocafuerte's executives intended to contact H.W. Wood through one person, and that "[Intermediary Company] should never be mentioned to [Seguros Sucre and Rocafuerte], and that any communication made by [H.W. Wood] to [Seguros Sucre and Rocafuerte] must be previously communicated to [Intermediary Company]."

30.     In this same email referenced in Paragraph 29, Pintado added that H.W. Wood

A-7

would collect payment of reinsurance premiums from Seguros Sucre and Rocafuerte and would "transfer the co-brokerage commission to [Intermediary Company] plus local acquisition costs that have been added to the offer."  Pintado also stated in the email, "We know that the chief executive of Sucre and Rocafuerte has received your email requesting a meeting with him during your stay in Ecuador. We know that within the next days you will receive a positive response. . . . We reiterate that Rocafuerte and Sucre are opened to H.W. Wood being the reinsurance broker option to help these companies for the placement of accounts of the public sector of Ecuador.  We insist that under no circumstance you should mention [Intermediary Company] in your conversations with the [Seguros Sucre and Rocafuerte] executives."

31.     H.W. Wood Employee responded the same day to the email referenced in Paragraphs 29 and 30, on or about October 4, 2013, and stated that he agreed with the contents of Pintado's email.

32.     On or about October 8, 2013, H.W. Wood Employee exchanged emails with Ribas and Foreign Official 1 to set up a meeting in Ecuador on October 10, 2023.  H.W. Wood Employee forwarded the exchange to Maldonado and Pintado and asked for the address of "where we will meet with Juan Ribas."

33.     On or about October 15, 2013, Maldonado emailed H.W. Wood Employee, copying Pintado, regarding "business in Ecuador" and stating, "[w]e knew your meeting with JR was excellent."  Maldonado also wrote regarding Seguros Sucre, "Remember they will send to you all the information, than [sic] we will know secretly. Then will begin a conversation between you and us for all the details of the placement."  Maldonado stated that the next step was for H.W. Wood to negotiate with reinsurers and "include us with BCC email" in those negotiations.

34.     On or about October 15, 2013, H.W. Wood Employee responded to the email

A-8

referenced in Paragraph 33, "It is great news that we have been granted the letters of authority on 5 accounts."

35.    On or about October 25, 2013, Maldonado emailed H.W. Wood Employee, copying Pintado, again cautioning H.W. Wood Employee, "remember that [Intermediary Company] can't appear in any document which is submitted to the insurer [Seguros Sucre], please be careful with this."

36.    On or about January 10, 2014, Maldonado emailed H.W. Wood Employee, copying Pintado, instructing H.W. Wood Employee to lie to a Seguros Sucre official ("Seguros Sucre Official") who was not part of their "team" and hide Intermediary Company's involvement. Maldonado wrote, "[Foreign Official 1] told me something about one email sent by [Seguros Sucre Official] asking to you [*sic*] the contacts in Ecuador because he view some documents notarized in Quito that I sent them yesterday. Please could you answer [Seguros Sucre Official] that you have a private law firm to help you with paperwork that you need in Ecuador, no more. [Seguros Sucre Official] is not connected to the team and does not know of the details that handle you, us and local contacts."

37.    The same day, on or about January 10, 2014, in response to an email from Seguros Sucre Official, H.W. Wood Employee concealed Intermediary Company's role, as instructed, writing, "As we do not have an Ecuadorian office, we use a private law firm to assist us with papers. We hope this is clear."

   B.    Agreement to Increase Intermediary Company's Commission to Pay "Local People Involved . . . Politically" in Obtaining the Business

38.    Early in its relationship with H.W. Wood, in or around December 2013, Intermediary Company orchestrated the award of a Rocafuerte policy with H.W. Wood and Tysers

A-9

as co-brokers. Intermediary Company demanded a higher portion of the commission on this policy than originally proposed by H.W. Wood in order to pay local individuals. Intermediary Company stated that if those individuals—who Intermediary Company refused to explicitly identify in the email, but were key Ecuadorian officials—were not paid it could cost H.W. Wood and Tysers this business and future public reinsurance business in Ecuador. H.W. Wood and Tysers both agreed to pay Intermediary Company a higher portion of the commissions they received on this business.

39.     Specifically, on or about December 5, 2013, Maldonado emailed H.W. Wood Employee, copying Pintado, requesting that the commission split for H.W. Wood and Tysers as co-brokers be 25 percent each to H.W. Wood and Tysers and 50 percent to "Ecuador."

40.     On or about December 31, 2013, after H.W. Wood learned it had been awarded certain public reinsurance business from Rocafuerte, H.W. Wood Employee stated in an email to Maldonado, Pintado, and Tysers Employee 3 that H.W. Wood would retain 37.5 percent of the commission and would pay Tysers 62.5 percent, of which 25 percent would be shared with Intermediary Company.

41.     On or about January 2, 2014, Pintado responded to the email referenced in Paragraph 40 from H.W. Wood Employee, copying Maldonado, and writing, "Only want to mention and remember the commitment we have to comply with local people who have given us the opportunity to get these public business (local acquisition costs). For this reason it is necessary to maintain the agreed commission percentages, (50% for Ecuador and 50% for London). Failure to meet our commitments to the local people, will could [*sic*] have the problem of losing the account and not have new opportunities for new public business. . . . With only 25% [Intermediary Company] can not pay the local cost of acquisition."

42.     On or about January 14, 2014, later in the same email chain referenced in

Paragraphs 40 and 41, H.W. Wood Employee wrote to Maldonado and Pintado, "In order for us to consider your request, we would ask for a breakdown of where this commission is going." Maldonado responded that of a proposed 43.34 percent to be paid to Intermediary Company, 18.34 percent would be retained by Intermediary Company and for "[l]ocal people involved commercial and politically in obtaining and achievement of this business: 25%.  More explicit I can't be."

43.     On or about January 16, 2014, H.W. Wood Employee forwarded the email chain referenced in Paragraphs 40 to 42 to Tysers Employee 3, asking for confirmation "that you agree to this please."

44.     On or about January 17, 2014, H.W. Wood Employee again forwarded the email chain referenced in Paragraphs 40 to 42 to Tysers Employee 3, asking him to "confirm whether or not you have agreed to the txt below.  Tysers Employee 3 responded, "[W]e think this is the best we are going to get particularly looking at the bigger picture for this year."

45.     After conferring with Tysers Employee 3, on or about January 21, 2014, H.W. Wood Employee emailed Maldonado and Pintado to agree to Intermediary Company's proposed commission split.  The final agreed commission split included the 25 percent reserved for "[l]ocal people involved commercial and politically in obtaining and achievement of this business."

46.     On or about April 2, 2014, in another email chain discussing a related commission split, H.W. Wood Employee stated to Maldonado and Pintado, "We specifically agreed to let you have 43% on this account previously since you had to look after others . . . ."

47.     Maldonado stated in his response to the email referenced in Paragraph 46, on or about April 2, 2014, "I'm sorry but it is an issue that does not depend on us and we must comply with what is asked of us."

48.     On or about June 13, 2014, in a discussion of commission splits regarding other

Seguros Sucre reinsurance business, H.W. Wood Employee acknowledged to Maldonado, copying Pintado, that "you have to look after third parties."

49.     On or about November 5, 2014, Maldonado sent an email to H.W. Wood Employee stating, "I know your meeting today with friends was very successful. I received good comments about it. [First name of Foreign Official 2] and [first name of another Rocafuerte official] will be happy to take a lunch with you if your time is available."  Later in the same email chain, Maldonado instructed H.W. Wood Employee, "don't comment our relationship including with [first name of Foreign Official 2] in front of [first name of other Rocafuerte official]."

50.     Before and after the emails referenced in Paragraph 49, H.W. Wood Employee received emails from Maldonado in which Maldonado (using a pseudonym account) was getting Seguros Sucre internal emails forwarded to him from Foreign Official 2.  Foreign Official 2 first forwarded the emails from his work account to his personal account before sending them to Maldonado.  Maldonado then forwarded the emails from his pseudonym account to his Intermediary Company account and then to H.W. Wood Employee.

51.     In or around March 2015, in an email chain discussing renewal of the same Rocafuerte reinsurance business, Intermediary Company again requested 50 percent of the commission based on expenses "like training for the insured and survey reports."  H.W. Wood Employee informed Intermediary Company that H.W. Wood had never been asked for surveys and H.W. Wood's compliance department was asking for more information, such as receipts for training and survey expenses.

52.     On or about March 12, 2015, Maldonado responded to the email referenced in Paragraph 51 to H.W. Wood Employee that Intermediary Company's costs included "various activities such as inspections, valuations, training, etc." as well as "acquisition costs that we have

already discussed many times."

53.     On or about March 12, 2015, H.W. Wood Employee replied to the email referenced in Paragraph 52 setting forth language for Maldonado to send to H.W. Wood in a separate email including, "In view that we have encompassed extra fees etc for the acquisition costs etc. . . ." According to H.W. Wood Employee's email, H.W. Wood would then confirm and provide an increased portion of the commission to Intermediary Company.

   C.   Intermediary Company Paid Bribes to Seguros Sucre and Rocafuerte Officials on Behalf of H.W. Wood, Tysers, and Intermediary Company

54.     Intermediary Company used producing broker commissions it received from H.W. Wood to pay bribes to Ribas and other Seguros Sucre and Rocafuerte officials.

55.     For example, on or about January 15, 2014, after H.W. Wood received premiums from Rocafuerte on certain public reinsurance business, Maldonado emailed H.W. Wood Employee requesting $38,266.55 as Intermediary Company's 50 percent share of commissions on that business "as soon as possible because we need to meet immediate local obligations."

56.     On or about January 31, 2014, H.W. Wood paid Intermediary Company approximately $38,267.

57.     Three days later, on or about February 3, 2014, Pintado transferred $30,000 from a bank account in his name in the Southern District of Florida to a bank account held for Ribas's benefit in the Southern District of Florida.

58.     Intermediary Company also used placing broker premiums it received from H.W. Wood to pay bribes to Ribas and other Seguros Sucre and Rocafuerte officials.  For example, around the same time as the bribe payment described above in Paragraphs 55 to 57, on or about January 10, 2014, H.W. Wood transferred approximately $91,966 in premiums on certain

Ecuadorian public reinsurance business to a bank account held in Panama by Intermediary Company, in its capacity as H.W. Wood's placing broker.

59.     Five days later, on or about January 15, 2014, Intermediary Company transferred approximately $50,500 of those funds to a bank account held in Pintado's name in the Southern District of Florida.

60.     The same day, on or about January 15, 2014, Pintado transferred approximately $25,000 of those funds from his account to a bank account held for Ribas's benefit in the Southern District of Florida.

61.     On or about April 16, 2014, H.W. Wood Employee forwarded to Maldonado an email from a Rocafuerte official regarding competition for another Rocafuerte public reinsurance policy.

62.     On or about April 17, 2014, Maldonado responded to the email referenced in Paragraph 61, "We clear the participation of other reinsurance broker.  The offer will be received only from Rocafuerte and HW Wood."  Maldonado then provided details of what the premium and commission split should be and stated, "We need your understanding and help in this case, bearing in mind all the efforts we have made to win this account and responding to local commitments that we must fulfill."

63.     A few months later, on or about July 17, 2014, H.W. Wood paid Intermediary Company approximately $150,567 related to this Rocafuerte reinsurance policy.  Intermediary Company also received approximately $30,042 from Tysers the same day.

64.     Six days later, on or about July 23, 2014, the Intermediary Company account in Panama that received both the H.W. Wood and Tysers payments transferred approximately

$50,025 to an account held for Ribas's benefit in the Southern District of Florida.

65.     On or about September 29, 2015, Martinez, a financial advisor for Ribas, sent an email to Merlo with bank account information for a nominee Swiss bank account held for Ribas's benefit.  Martinez had also established a nominee Swiss bank account for the benefit of Foreign Official 1, to which Intermediary Company made bribe payments during the course of this scheme.

66.     On or about October 2, 2015, Merlo, while in the Southern District of Florida, emailed Martinez a model contract to be used to provide a justification for bribe payments funded by H.W. Wood and Tysers.  The model contract described purported investments to be made in Ribas's company by Intermediary Company.  Merlo advised that Martinez could make any modifications he thought appropriate.

67.     On or about October 22, 2015, Martinez emailed Merlo, in the Southern District of Florida, an executed copy of the contract between Intermediary Company and Ribas's company.

68.     On or about November 6, 2015, Pintado paid a bribe of approximately $175,753 from an account held in the name of Intermediary Company in Panama through a correspondent bank in the United States to the Swiss bank account held for Ribas's benefit.

69.     On or about December 1, 2015, Pintado paid a bribe of approximately $76,000 from an account held in the name of Intermediary Company in Panama through a correspondent bank in the United States to the Swiss bank account held for Ribas's benefit.

70.     On or about January 4, 2016, Pintado paid a bribe of approximately $54,000 from an account held in the name of Intermediary Company in Panama through a correspondent bank in the United States to the Swiss bank account held for Ribas's benefit.

71.     On or about October 6, 2016, Pintado paid a bribe of approximately $20,000 from an account held in the name of Intermediary Company in Panama to an account held in the name

of Foreign Official 3.

72.    On or about April 7, 2017, Pintado paid a bribe of approximately $10,000 from an account he controlled in Panama to an account held in the name of Foreign Official 2.

73.    On or about October 25, 2017, Foreign Official 3, while in the Southern District of Florida with another Seguros Sucre official, requested in a text message to Merlo to meet where they would not be seen by others.

74.    Moments later, on or about October 25, 2017, Merlo responded in a text message that his home was (translated from Spanish) "super private" and that "we meet in my house and no one sees us."  Foreign Official 3 responded with a text message that stated (translated from Spanish), "perfect."

75.    On or about October 25, 2017, Merlo and Foreign Official 3 met at Merlo's home in the Southern District of Florida in furtherance of the scheme.

76.    In total, Intermediary Company paid Ribas approximately $2,232,005 in bribe payments in connection with awarding reinsurance business to H.W. Wood and to Tysers.

77.    Intermediary Company paid Foreign Official 1 at least approximately $289,778 in bribes in connection with the H.W. Wood and Tysers scheme.

78.    Intermediary Company paid Foreign Official 2 at least approximately $150,000 in bribes to a bank account in the Southern District of Florida held in Foreign Official 2's name in connection with the H.W. Wood and Tysers scheme.

79.    Intermediary Company paid Foreign Official 3 at least approximately $125,000 in bribes to a bank account in the Southern District of Florida held in Foreign Official 3's name in

connection with the H.W. Wood and Tysers scheme.

        D.   <u>Meeting between H.W. Wood Employee and Merlo in Miami</u>

80.     Maldonado and H.W. Wood Employee discussed setting up a meeting between H.W. Wood Employee and Merlo for April 5, 2016, at Intermediary Company's office in Miami, Florida.  In those discussions, Maldonado referred to Merlo as "the senior partner of our group" who was "very important to maintain the relationship and presence of [H.W. Wood] in the accounts."

81.     On or about April 4, 2016, upon learning Maldonado would not be at the meeting, H.W. Wood Employee asked, "Do I discuss [Intermediary Company], what about the commissions we give to you etc etc. Does he know our relationship and how much does he know?" Maldonado responded, "Esteban [Merlo] knows exactly how we operate and detail of our operations, it is as if you were talking with us."

82.     Prior to H.W. Wood Employee's meeting with Merlo in Miami, on or about March 23, 2016, H.W. Wood Employee was notified by Rocafuerte that H.W. Wood would be losing certain public reinsurance business with Rocafuerte.  Foreign Official 2 was copied on the email.

83.     On the same day, on or about March 23, 2016, H.W. Wood Employee forwarded the email referenced in Paragraph 77 to Maldonado and Pintado, expressing concern, asking whether it was still worth coming to Miami to meet Merlo, and asking, "Why has his [*sic*] moved and what about your connections?"

84.     Later in the same email chain referenced in Paragraphs 77 and 78, on or about March 24, 2016, H.W. Wood Employee confirmed he would still travel to Miami to meet with Merlo, but stated, "We have not seen any new offers from SS or Roca and now seem only to be losing accounts.  I know that our friends have to use other brokers as well but at the moment this

all seems to be one way traffic."

85.      H.W. Wood Employee did travel to Miami to meet with Merlo.  On or about April 6, 2016, Merlo texted a picture of himself and H.W. Wood Employee with a bottle of champagne to Maldonado and instructed Maldonado about giving H.W. Wood Employee (translated from Spanish) "more production," asking Maldonado to advise about any new business and to tell Ribas to give business to H.W. Wood.

86.      After this meeting, H.W. Wood continued to obtain business with Seguros Sucre and Rocafuerte through Intermediary Company.

ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS
### FOR H.W. WOOD LIMITED

WHEREAS, H.W. Wood Limited (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the award of reinsurance business and assist in obtaining and retaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section; and

WHEREAS, the Company's Managing Director, Steven Rudduck, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the one-count Information charging the Company with an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to accept a monetary penalty against the Company totaling $508,000, and

B-1

to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

      2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

      3.     The Managing Director of the Company, Steven Rudduck, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Managing Director of the Company, Steven Rudduck, may approve;

      4.     The Managing Director of the Company, Steven Rudduck, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.     All of the actions of the Managing Director of the Company, Steven Rudduck, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: 6TH November 2023

By:

Steven Rudduck
Managing Director
H.W. Wood Limited

B-3

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws (collectively, the "anti-corruption laws"), H.W. Wood Limited (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance programs, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of the anti-corruption laws, compliance policies, and Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.      The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them.  The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

4.      The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, and in particular foreign bribery risks facing the Company.

5.      On the basis of their periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of the anti-corruption laws, its compliance policies, and its Code of Conduct.

*Policies and Procedures*

6.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FPCA and other applicable anti-corruption laws (collectively, the "anti-corruption laws"), which shall be memorialized in a written compliance policy or policies.

7.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-

corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including all agents and business partners.  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.  Such policies and procedures shall address:

      a.      gifts;

      b.      hospitality, entertainment, and expenses;

      c.      customer travel;

      d.      political contributions;

      e.      charitable donations and sponsorships;

      f.      facilitation payments; and

      g.      solicitation and extortion.

8.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

      a.      transactions are executed in accordance with management's general or specific authorization;

      b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

       c.       access to assets is permitted only in accordance with management's general or specific authorization; and

       d.       the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

9.      The Company shall review its anti-corruption compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

10.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance policies and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

11.     The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-corruption compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal

C-4

audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

12.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Companies' anti-corruption compliance policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Confidential Reporting Structure and Investigation of Misconduct*

13.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's Code of Conduct or anti-corruption compliance policies and procedures.

14.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance policies and procedures.

*Compensation Structures and Consequence Management*

15.     The Company will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the anti-corruption laws, its compliance policies, and its Code of Conduct.  These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system subject to local labor laws.

16.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Management*

17.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

C-6

      a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

      b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's Code of Conduct and anti-corruption compliance policies and procedures; and

      c.     seeking a reciprocal commitment from agents and business partners.

18.    The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials. The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region. The Company will engage in ongoing monitoring and risk management of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

19.  Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's

Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

20.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

21.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

      a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 6-7 above on the anti-corruption laws and the Company's compliance policies and procedures regarding anti-corruption laws;

      b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable;

      c.     where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

22.     The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's Code of Conduct and anti-corruption

compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

23.     The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

24.     The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures.  The Company will timely and appropriately remediate the root causes of misconduct.  The Company will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

ATTACHMENT D

## COMPLIANCE REPORTING REQUIREMENTS

H.W. Wood Limited (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") periodically. During the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures described in Attachment C.  The Company shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare at least two follow-up reviews and reports, as described below.  Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review.

In conducting the reviews, the Company shall undertake the following activities, among others:  (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with the FCPA and other applicable anti-corruption laws; (b) inspection and testing of the Company's systems procedures, and internal controls,  including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and comprehensive testing of the Company's compliance program.

### *Written Work Plans, Reviews and Reports*

a.      The Company shall conduct a first review and prepare a first report, followed by at least two follow-up reviews and reports.

b.      Within sixty (60) calendar days of the date this Agreement is executed, the Company shall, after consultation with the Fraud Section, prepare and submit a written work plan

to address the Company's first review.  The Fraud Section shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

        c.      With respect to each follow-up review and report, after consultation with the Fraud Section, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

        d.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.

        e.      Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

        f.      No later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the FCPA and other applicable anti-corruption laws.  The report shall be transmitted to:

           Deputy Chief – FCPA Unit
           Deputy Chief - CECP Unit
           Criminal Division, Fraud Section
           U.S. Department of Justice
           1400 New York Avenue, NW
           Bond Building, Eleventh Floor
           Washington, DC 20005

The Company may extend the time period for issuance of the first report with prior written approval of the Fraud Section.

### *Follow-up Reviews and Reports*

g.      The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the FCPA and other applicable anti-corruption laws.

h.      The first follow-up ("second") review and report shall be completed by no later than one year after the first report is submitted to the Fraud Section.

i.       The second follow-up ("third") report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

j.      The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section.

### *Confidentiality of Submissions*

g.      Submissions by the Company, including the work plans and reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Fraud Section determines in its sole discretion that disclosure

would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**<u>CERTIFICATION</u>**

To:      United States Department of Justice
         Criminal Division, Fraud Section
         Attention:  Chief of the Fraud Section


Re:       Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 6 of the deferred prosecution agreement ("the Agreement") filed on _____ in the United States District Court for the Southern District of Florida, by and between the United States of America and H.W. Wood Limited (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the Agreement, which includes evidence or allegations of any violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States committed by the Company's employees or agents ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Fraud Section's determination whether the Company has satisfied its obligations under the Agreement.

E-1

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____      Name (Printed): _____

                                Name (Signed): _____
                                Chief Executive Officer
                                H.W. Wood Limited

Date: _____      Name (Printed): _____

                                Name (Signed): _____
                                Chief Financial Officer
                                H.W. Wood Limited

E-2

ATTACHMENT F

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section

Re:     Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 17 of the Deferred Prosecution Agreement filed on _____, in the United States District Court for the Southern District of Florida, by and between the United States of America and H.W. Wood Limited (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 11 and 12 of the Agreement, and that, based on a review of the Company's reports submitted to the Department of Justice, Criminal Division, Fraud Section pursuant to Paragraph 13 of the Agreement, the reports are true, accurate, and complete.

In addition, the undersigned certify that, based on the undersigned's review and understanding of the Company's anti-corruption compliance program, the Company has implemented an anti-corruption compliance program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of the anti-corruption laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer ("CEO") of the Company and the Chief Compliance Officer ("CCO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

F-1

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____     Name (Printed): _____

 

 

Name (Signed): _____
Chief Executive Officer
H.W. Wood Limited

Date: _____     Name (Printed): _____

 

 

Name (Signed): _____
Chief Compliance Officer
H.W. Wood Limited